VARO, INC.

v.

The UNITED STATES.

No. 369–74.

United States Court of Claims.

Jan. 26, 1977.

---

Marshall J. Doke, Jr., Dallas, Tex., attorney of record for plaintiff. Daniel J. Riley and Rain, Harrell, Emery, Young & Doke, Dallas, Tex., of counsel.

Richard J. Webber, Washington, D.C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D.C., for defendant.

Before COWEN, Chief Judge, and DAVIS and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND
DEFENDANT'S CROSS–MOTION
FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on defendant's requests, filed May 21, 1976, for review of the recommended decision of Senior Trial Judge Mastin G. White, filed on April 15, 1976, pursuant to Rule 166(c), wherein he recommended judgment for the plaintiff on both claims. The plaintiff petitioned for review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322, of two decisions of the Armed Services Board of Contract Appeals (ASBCA), Nos. 16087 and 16146, 73–2 BCA¶ 10,206, on motion for reconsideration, 74–1BCA¶ 10,458, construing and applying a contract, No. DAAA BO 7–68–C–0291, for fabrication and supply of 135 searchlights, and a larger number of xenon lamps, some to be incorporated in the searchlights, some to be furnished as spares.

Upon consideration of the recommended decision, together with the defendant's objections thereto and the briefs and oral arguments of counsel, the court agrees with the said decision and adopts and affirms the same as the basis for its judgment in this case. We find no comment by us necessary for addition to the trial judge's observations on ASBCA No. 16087. With respect to No. 16146, the parties invited our closest attention to whether the trial judge misconstrued the contract, and we deem it will be helpful to add a few words to his on that subject, although we fully agree with him.

The procurement being novel, the plaintiff was originally required to furnish the usual "first articles" for testing, samples both of the searchlights and of the lamps, as they were to be, before starting production. As to the lamps, it was also required to furnish, for the same purpose, two out of the first ten of the regular production run, to be selected at random. It procured all its lamps by subcontract from Hanovia, Inc. Hanovia also had a prime contract by which it furnished 200 of the same type of xenon lamps direct to the Army. It planned to and did produce all the lamps, under both the prime contract and the subcontract, in a single unbroken production run, scheduling the prime contract lamps first. By reason of contract engagements between the Army and Hanovia, with which Varo had nothing to do, the Army agreed to accept three out of the first ten lamps in the regular production run, as and for both the "first articles" and the initial production samples. The Army sent them to General Testing Laboratories, which performed the required tests at a cost to the Government of approximately $6,000 per lamp. There was no effort to pass this cost through to Hanovia.

Varo then suggested, and the Government agreed, that the testing of lamps under its prime contract had become a useless expense. It was eliminated and the lamps were accepted on the basis of the tests above mentioned. There was at the time no caveat that a price reduction would be demanded. However, at a later date defendant asserted that Varo had been let out of performing five tests, three "first article" lamps and two initial production run lamps, and the defendant was therefore entitled to a price reduction under the Changes Article. The Board agreed, measuring the amount of the reduction by the cost of performing five sets of tests at General Testing Laboratories, $30,000 in all. It appears that Varo, if required to perform any of the five, would or might have had to pay General Testing Laboratories itself, unless it could have passed the obligation on to Hanovia pursuant to the latter's subcontract commitment to furnish "qualified" lamps at a final price. More certain grounds of decision appear available.

 With regard to the two initial production lamps, the trial judge concludes, and we agree, that the tests were actually performed, since the first ten of the entire production run, not of the portion scheduled for Varo, were the only ten from which the samples could have been selected. That Varo benefited from having tests of these run without cost to it is not due to a change order, but to a fortuitous circumstance, of which it is entitled to garner the benefit. This is true even though, as the trial judge

recognizes, the original contract was clear that Varo would bear the expense of testing the initial production lamps.

As to the three "first article" lamps the issue is much closer, and able counsel on both sides found material in the original contract, going for them. Plaintiff argued that by that contract, it was not obliged to test the "first article" lamps, but only to deliver them for Government testing, so that before any change order the General Testing Laboratories bill would still have been rendered to the Government. Therefore, it was not let out of anything. Defendant would have us find it perfectly clear that the original contract required plaintiff to pay for "first article" testing of the involved lamps.

Defendant finds a linchpin for its argument in Par. 4.1 of the Military Specification, which it says the trial judge "inexplicably failed even to mention." It reads as follows:

> 4.1 Responsibility for inspection.— Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified, the supplier may utilize his own facilities or any commercial laboratory acceptable to the Government. The Government reserves the right to perform any of the inspections set forth in the specification when such inspections are deemed necessary to assure [that?] supplies and services conform to prescribed requirements.

Defendant deduces from this that the contractor must "inspect" which includes testing, at his expense, unless some clear and specific provision assumes this obligation for the Government. It fails to find any such provision in the contract documents. It says the trial judge mistakenly applied provisions written, not for the lamps, but for the searchlights. It is clear the Government originally intended to test the searchlights itself.

Par. 4.3 tells what tests are required under the "inspection" rubric, for the lamps, but fails to say who is to do it. Par. 3.2.1 is quoted by the trial judge. Under the heading: *First Article Model,* the supplier is to "furnish" three lamps "to prove, prior to starting production, that his production methods * * *" will do the job. Defendant says "furnish" means "produce or make available," and the provision sought only to prescribe the number of lamps to be manufactured for testing. "Furnish" is a protean word. We note, however, the first definition of "furnish" in Webster's Unabridged:

> 1a. To provide or supply with what is needed.

The word thus seems to denote a recipient, having a need. As a verb, it has an object, which may be the thing furnished, or the needy recipient. Whichever it is, the other comes into the sentence by way of a preposition. You "furnish the hungry with food," or you "furnish food to the hungry." The right question therefore is, what recipient is implied here? It seems to be the Government, for how else would the mere furnishing prove anything? The language bears the weight the trial judge places on it; at its best for defendant it is ambiguous.

With respect to the "contract notes" the trial judge next refers to, defendant says the ones he cites refer solely to the searchlights "furnished" as "first articles." The plaintiff answers that when the writer of the "notes" wishes to refer only to searchlights, he says so, as in Note 4a. We think that the "notes" defy explanation according to any consistent and coherent theory; however ICLE 18(i) indicates that the "first article offered" must be manufactured at the facilities where the item is to be produced, or "if the first article is a component," the first article must be manufactured at the facilities where "the component is to be produced." Since the lamps were components, this meant that "first article" lamps had to be produced by Hanovia. The provision appears inconsistent with the idea that these provisions respecting "first articles" in part 2(a) and *ff.* of the notes, refer only to searchlights. The references in these notes to "item 0001" are references to the searchlights, which are designated as "item

0001" in the contract. Since the lamps are components of "item 0001," though also supplied separately, the author's intentions are unclear.

Plaintiff says that Par. 4.1 was boiler plate. That the other specifications and notes were not written with an eye constantly upon it is clear since defendant, contrary to its present theory, spelled out that Varo had to perform the tests on the lamps selected as initial production samples. By defendant's theory, this should have been understood from Par. 4.1. The contracting officer testified at the Board hearing that he would read Note 2(a) as requiring the Government to test the lamps for "first article" approval. The Board elected to disregard this on the basis of its finding that he was confused, but cleared it up in another testimony. If he was at least temporarily confused, he was a charter member of a club which our trial judge and this panel have subsequently joined. If the Government is unable to write specifications its own contracting officers will readily understand, it must expect difficulties with independent tribunals and courts. While we do not address the waiver issue, the fact that defendant's officers did not assert any claim to a price reduction when they first let plaintiff out of performing the tests, is for consideration in determining whether the "confusion" existed then, as it did later.

If we suppose that defendant was protecting itself, it is difficult to see any reason why it would have insisted on performing its own "first article" testing on the searchlights, as it clearly did, but trusted Varo as to the lamps, both being primary items, not mere components.

■ We conclude that the original contract, taken at its best for defendant, was ambiguous as to whether it required plaintiff or defendant to pay for testing of xenon lamps furnished as "first articles." This being so, by the doctrine of *contra proferentem*, defendant loses on that issue. It is therefore not possible to sustain the Board decision in No. 16146, that plaintiff

failed to do work the contract required it to do.

According to the foregoing, as well as to the trial judge's decision which follows, the plaintiff's motions for summary judgment are allowed, the defendant's cross motion for summary judgment is denied, and judgment is entered for the plaintiff in the sum of $37,118.16.

**WHITE, Senior Trial Judge:**

In two companion motions for summary judgment, the plaintiff requests the court to review, under the standards prescribed in the Wunderlich Act (41 U.S.C. §§ 321–322 (1970)), determinations made by the Armed Services Board of Contract Appeals on two claims for equitable adjustments asserted by the Government against Varo, Inc. ("Varo"), the present plaintiff, on the ground that certain requirements originally imposed on Varo by the provisions of a contract between the parties had been relaxed by the Government, or at least had not been met by Varo. The proceedings before the Board relative to the two claims were designated as ASBCA No. 16087 and ASBCA No. 16146; and the Board's determinations on the claims were announced in the form of a single opinion, dated August 15, 1973.

Under the contract in question, which was numbered DAAB 07–68–C–0291 and was entered into on May 31, 1968, Varo was to produce and deliver to the Army a total of 135 searchlights, together with a maintenance and repair kit for each searchlight. The contract was to be performed over a 2-year period, and Varo was to receive a fixed price of $3,120,000 for the 135 searchlights and accompanying kits.

Each searchlight was to be equipped with a xenon lamp as the major component, and the maintenance and repair kit for each searchlight was to contain a xenon lamp as a spare part. Thus, the contract required Varo to supply a total of 270 xenon lamps to the Army—135 lamps as major components of the searchlights and 135 additional lamps as spare parts.

On June 29, 1968, which was approximately a month after the searchlight contract was awarded to Varo, the Army awarded to a lamp manufacturer known as Englehard Hanovia, Inc. ("Hanovia"), a contract under which Hanovia was to supply 200 xenon lamps directly to the Army. The lamp specification in the lamp contract between the Army and Hanovia and the lamp specification which formed part of the searchlight contract between the Army and Varo were identical.

Thereafter, on September 19, 1968, Varo entered into a subcontract with Hanovia under which Hanovia was to produce and supply to Varo 170 of the xenon lamps which Varo needed for the performance of its searchlight contract with the Army. The subcontract required Hanovia to supply lamps that "qualified" under the lamp specification in the searchlight contract between Varo and the Army (which, as previously stated, was the same as the lamp specification in the Army's lamp contract with Hanovia). The subcontract contained a "special note" which placed upon Hanovia the responsibility of performing all the tests that might be required to qualify the lamps for acceptance under the lamp specification.

When the Army's contracts with Varo and Hanovia—and Varo's subcontract with Hanovia—were made, neither Hanovia nor any other lamp manufacturer had produced a lamp that qualified under the lamp specification previously mentioned. Accordingly, it was Hanovia's responsibility, under its prime contract with the Army and under the subcontract from Varo, to produce such a lamp.

The controversies that are involved in the present litigation will be discussed under headings indicating the numbers assigned by the ASBCA to the respective administrative proceedings.

### ASBCA No. 16087

The lamp specification, as originally set out in the Varo searchlight contract and in the Hanovia lamp contract, described certain electrical characteristics which each lamp was required to possess, and prescribed a test that was to be performed on each lamp in order to determine whether it possessed the required electrical characteristics. The prescribed electrical characteristics test was phrased as follows in paragraph 4.6.2 of the lamp specification:

4.6.2 *Electrical Characteristics.*—The lamp shall be operated for 20 minutes at 20 KW and the lamp voltage shall be measured. At the conclusion of the 20 minute operation at 465 amperes the lamp shall be subjected to 12 cycles consisting of the following: The lamp shall be started at 800 amperes current, and maintained for 5 seconds. The lamp current shall be permitted to drop to not less than 465 amperes within 5 minutes. The lamp shall be turned off for not less than 2 minutes prior to conducting the next cycle. During the 5 second period the lamp voltage and current shall be measured. Operation other than as specified in 3.9.3 or damage to the lamp shall constitute failure of this test.

In the fall of 1968, two xenon lamps that had been fabricated by Hanovia at the outset of its production program were tested in order to determine whether they fully met the requirements of the lamp specification. These lamps failed to meet the prescribed requirements. With respect to the electrical characteristics test, quoted in the preceding paragraph of this opinion, it was discovered during the testing process that the application to the lamps of 800-ampere pulses for 5-second intervals, as required by paragraph 4.6.2 of the lamp specification, caused melting on anode surfaces.

Following negotiations between Hanovia and the Army, the Army changed the electrical characteristics provisions of the lamp specification in the Hanovia lamp contract so as to provide: (1) that in the performance of the electrical characteristics test, the lamp should be subjected to a starting current of 825 amperes (plus or minus 25 amperes) for a period of 1 second (plus or minus 100 milliseconds) in each of the 12 5-minute cycles of operations, with the lamp voltage and current being measured during the 1-second period; and (2) that the

electrical characteristics test should be performed on one lamp out of each group of 100 lamps produced, or on one lamp during each 60 days of production, whichever occurred first.

After the electrical characteristics provisions of the lamp specification in the Hanovia lamp contract were changed by the Army, as outlined in the preceding paragraph of this opinion, Varo requested that the lamp specification in its searchlight contract be similarly revised, without any reduction in the contract price. The contracting officer's designated representative for the Varo searchlight contract and a technical representative of the contracting officer both recommended favorable action on Varo's proposal. However, when the contracting officer issued a unilateral change order in November 1969, making changes in the lamp specification of the Varo searchlight contract identical with those previously made in the lamp specification of the Hanovia lamp contract, the change order provided that an equitable adjustment of the contract price "shall be made."

On March 24, 1970, Varo increased its subcontract with Hanovia by ordering 101 additional xenon lamps in order to complete the performance of Varo's searchlight contract with the Army (only 100 additional lamps were actually needed for this purpose). These lamps were to comply with the revised lamp specification. The unit price for the 101 lamps was identical with the unit price for the 170 xenon lamps originally ordered by Varo from Hanovia in September 1968.

Hanovia produced 271 xenon lamps for Varo, and successfully tested four of these lamps for electrical characteristics, in accordance with the lamp specification, as changed.

A dispute arose between the contracting officer and Varo as to whether the Army was entitled to a downward adjustment in the contract price under the searchlight contract because the result of the change in the lamp specification was to relieve Varo—and, therefore, Hanovia—of the necessity of testing, for electrical char-

acteristics, 266 of the 270 xenon lamps which Varo was required to furnish, and did furnish, the Army in the performance of the searchlight contract. The outcome of the dispute was a decision by the contracting officer to the effect that the contract price should be reduced by the amount (as subsequently revised) of $13,861.80.

Varo took an appeal to the Armed Services Board of Contract Appeals from the contracting officer's decision mentioned in the preceding paragraph. After a hearing, the Board rendered its decision of August 15, 1973.

The evidence before the Board showed that the changes in the lamp specification previously mentioned did not have any effect on Varo's costs in performing its searchlight contract with the Army. Before the changes were made, Varo had entered into a subcontract with Hanovia under which the latter was to manufacture and supply to Varo, at a fixed price, xenon lamps that "qualified" under the lamp specification. The subcontract price was firm, and it covered the testing by Hanovia of lamps to ensure that they possessed the essential electrical characteristics. Thus, Varo's costs involved in procuring the lamps from Hanovia were not reduced by reason of the Army's action in reducing the number of lamps that had to be tested for electrical characteristics.

On the other hand, since the original requirements that every lamp be tested for electrical characteristics was relaxed by the Army to the extent that only four of the 270 lamps involved in the searchlight contract had to be tested by Hanovia, this change did reduce to some extent Hanovia's costs in testing lamps for electrical characteristics under the subcontract from Varo. On this point, the Board made a factual finding "that elimination of 266 tests resulted in a cost saving to Hanovia of $7,118.16 (266 × the $26.76 per lamp actual cost as performed by Hanovia)."

In discussing the problem of whether, under the circumstances, the Government was entitled to an equitable adjustment

downward in the contract price, the Armed Services Board of Contract Appeals said:

> * * * Where work or material is deleted regardless of who is to perform the work or supply the material, there as a presumption that the prime contractor will benefit by the saving. If the prime contractor has made subcontracts which unreasonably frustrate the Government's right to obtain such savings via the contractual chain, this is a problem which the prime contractor must solve on his own. * * *

The Board concluded its consideration of ASBCA No. 16087 by deciding that the Government was entitled to a reduction of $7,118.16 in the contract price, this being the amount by which (according to the Board's finding) Hanovia's costs of performing its subcontract with Varo were reduced as a result of the Army's action in reducing the number of lamps to be tested for electrical characteristics from 270 to four.

[4] However, the "presumption that the prime contractor will benefit by the saving" involved in a contractual change was overcome in this instance by evidence before the Board showing that Varo, the prime contractor, did not benefit from the reduction in Hanovia's costs of performing the subcontract.

This court has used the following language in defining the standard that should be utilized to determine whether a contractual change justifies an equitable adjustment in a contract price:

> Equitable adjustments * * * are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract. Since the purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification, it appears patent that the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which the contractor finds himself by reason of the modification. * * * [Bruce Construction Corp.

v. United States, 324 F.2d 516, 518, 163 Ct.Cl. 97, 100 (1963).]

In the present case, as previously stated, Varo's position was not altered to any extent by reason of the Army's action in changing the number of lamps to be tested for electrical characteristics. The price that Varo had to pay Hanovia for 270 lamps which "qualified" under the lamp specification was the same, irrespective of whether Hanovia tested 270 lamps, or only four lamps, to determine that the lamps possessed the essential electrical characteristics.

To summarize the situation, Varo did not deprive any financial benefit—or suffer any detriment—from the change that was made in the lamp specification relative to testing for electrical characteristics. Since alteration in a contractor's position is the proper standard to use in determining whether an equitable adjustment is appropriate, it necessarily follows that the Armed Services Board of Contract Appeals erred in awarding the Government an equitable adjustment downward of $7,118.16 in the contract price, on the claim involved in ASBCA No. 16087.

If the Board's award of $7,118.16 to the Government in ASBCA No. 16087 were to be consummated, this would place Varo in a worse financial situation than it would have been in if the original provision of the lamp specification relative to testing for electrical characteristics had remained in effect, without change. This would be contrary to the court's pronouncement that the purpose of an equitable adjustment is "to keep a contractor whole when the Government modifies a contract."

It might be mentioned, in connection with this particular point, that there is no showing of any disadvantage or detriment suffered by the Government because only four lamps, rather than 270 lamps, were tested for electrical characteristics by Hanovia. Despite the reduction in the number of lamps tested for electrical characteristics it appears that the Government still received the number of lamps, and lamps of

the quality, which it had contracted for with Varo.

■ Hanovia did derive some financial benefit, under its subcontract with Varo, from the relaxation of the requirement concerning the number of lamps that had to be tested for electrical characteristics. However, this circumstance does not entitle the Government to an equitable adjustment downward in the price of the prime contract with Varo, since Hanovia's benefit did not inure to Varo, the prime contractor. Consequently, it is not necessary to consider a contention by the plaintiff in the present litigation that the Board's factual finding that Hanovia's financial benefit from the testing change amounted to $7,118.16 is not supported by substantial evidence in the record.

### ASBCA No. 16146

■ In this portion of the case, the court is asked to review a decision by the Armed Services Board of Contract Appeals that the Government was entitled to an equitable adjustment downward of $30,000 in the price of Varo's searchlight contract on the ground that Varo did not, in accordance with the contract, perform first-article tests on three xenon lamps, and did not perform initial-production tests on two lamps. The Board made a factual finding, in connection with this point, that the cost of performing the first-article tests and the initial-production tests would have been $6,000 per lamp.

As indicated in the preceding part of this opinion, Varo was required to furnish to the Army a total of 270 xenon lamps in performing the searchlight contract; and Varo entered into a subcontract with Hanovia under which the latter was to manufacture, test, and supply to Varo "qualified" lamps that Varo needed in performing the searchlight contract. Also, the Army entered into a prime contract with Hanovia, under which Hanovia agreed to furnish, and did furnish, 200 xenon lamps directly to the Army.

The Army's contracts with Varo and with Hanovia each initially required first-article testing of three preproduction xenon lamps

and initial-production testing of two lamps selected by the Government at random out of the first 10 lamps produced after the start of the regular production run. As stated previously in this opinion, no xenon lamp qualifying under the lamp specification involved here had been manufactured as of the time when the Army entered into the contracts with Varo and with Hanovia; and the prescribed first-article and initial-production testing was designed to ensure that the lamps produced under the two contracts would fully comply with the requirements of the pertinent lamp specification.

The Army's contract with Hanovia initially provided that the first-article tests on xenon lamps under that contract would be performed by the Government and that the initial-production tests would be performed by Hanovia. On January 13, 1969, however, a supplemental agreement was made between the Army and Hanovia, which provided that Hanovia would perform both the first-article and the initial-production testing of xenon lamps under the Army's prime contract with Hanovia, but that the first-article tests would be performed concurrently with, and on the same two lamps to be used for, the initial-production tests.

Hanovia successfully completed the first-article and the initial-production testing of two xenon lamps in April 1969; and Hanovia's report on these tests was approved by the Army on June 5, 1969.

Hanovia, in producing xenon lamps, did not distinguish between the lamps which it needed to fulfill its prime contract with the Army and the lamps which it needed to fulfill its subcontract with Varo. It made a continuous production run, after the approval of the first-article and initial-production tests, and then allocated the lamps, as needed, to its prime contract with the Army and its subcontract with Varo.

On June 30, 1969, Varo submitted to the Army a first-article and initial-production test report, which stated in pertinent part as follows:

* * * Hanovia successfully completed their qualification testing under con-

tract DAAB07–68–C–0430 [Hanovia's prime contract with the Army]. This lamp will be used in production searchlights * * *.

Varo attached to its test report a copy of Hanovia's test report on xenon lamps, which, as previously stated, had been submitted to, and approved by, the Army under Hanovia's prime contract with the Army.

Varo's first-article and initial-production test report, based on Hanovia's testing of xenon lamps, was approved by the contracting officer on July 17, 1969, in a communication which simply stated, without any qualification or reservation, that the test report submitted under Varo's contract was approved.

Some time after Varo's first-article and initial-production test report was approved by the contracting officer on July 17, 1969, a successor contracting officer demanded payment by Varo of $46,603.17 (later reduced to $32,993.69), on the ground that Varo had failed to perform first-article and initial-production tests on a total of five xenon lamps. Varo appealed to the Armed Services Board of Contract Appeals from the successor contracting officer's decision.

The Board found that it would have cost Varo $6,000 per lamp to perform first-article testing of three xenon lamps and initial-production testing of two xenon lamps. The Board, although agreeing with Varo that it would not have made any "economic sense" for Varo to run a second series of first-article and initial-production tests after Hanovia, the manufacturer of the lamps, had successfully performed a series of such tests, nevertheless held that the "Omission of one series of tests resulted in a saving, and it is precisely that saving which the Government is claiming, and which the Board rules should be paid to the Government." Accordingly, the Board decided that the Government was entitled to an equitable adjustment downward of $30,-000 ($6,000 per lamp × 5 lamps) in the price of Varo's searchlight contract.

One of the issues involved in this aspect of the case is whether, as held by the Board, Varo was obligated by its contract with the Army to perform (or to have performed) first-article and initial-production tests on a total of five lamps.

In connection with the problem just mentioned, it is clear—and Varo does not contend otherwise—that Varo had the responsibility of performing (or having performed) initial-production tests on two lamps, "selected at random by the Government from the first 10 lamps being produced from production tooling * * * to determine conformance with the requirements of this [lamp] specification."

With respect to the matter of first-article testing, paragraph 3.2.1 of the lamp specification provided in part as follows:

3.2.1. *First Article Model.*—The supplier shall furnish three lamps within the time frame specified in the contract or purchase order to prove, prior to starting production, that his production methods will produce lamps that comply with the requirements of this specification. Examination and tests shall be those specified herein. * * *

Although the provision of the lamp specification quoted in the preceding paragraph did not expressly state who was to perform the first-article tests[1] on the three preproduction lamps, the statement that the supplier should "furnish" three lamps for testing clearly implied that Varo was merely to furnish the lamps (or to have them furnished) to the Government for first-article testing by the Government.

This view derives support from certain provisions contained in the "contract notes" which formed part of Article 1 of the basic contract between Varo and the Army. For example, paragraph "a" of note 2 stated in part that "The approved first article samples will be *returned* to the contractor for

1. Paragraph 4.4 stated that the examination, or inspection, of the first-article models was to be performed by the contractor, under the supervision of a representative of the contracting officer, but was silent as to who was to perform the tests.

reconditioning after first article testing is completed" (emphasis supplied).

Thus, it appears that the contract between Varo and the Army, at least as originally entered into, placed the responsibility on the Government to perform first-article tests on three xenon lamps, and placed the responsibility on Varo to perform (or to have performed) initial-production tests on two xenon lamps.

In connection with this point, consideration should be given to a portion of paragraph "c" of note 2 and to note 3, as initially phrased and as subsequently revised.

Paragraph "c" of note 2 initially provided in part as follows:

The Government will subject the first article to the following tests:

Tables I and II of Military Specification MIL–S–55572(EL) for Searchlight * * *, and to any other nondestructive tests considered necessary by the Government to assure that the first article meets the requirements of the contract and its subsidiary documents.

Note 3 initially provided that "One hundred eighty (180) days after date of award of contract, the two first articles shall be delivered for Government testing to" the U. S. Army Electronics Command at Fort Belvoir, Virginia; and that "The Government will require thirty (30) calendar days to conduct testing and notify the contractor of the result of the tests."

Later, a change order (1) amended paragraph "c" of note 2 by eliminating the phrase "The Government will subject the first article to the following tests" and substituting for it the phrase "The first articles shall be subjected to the following tests"; and (2) revised note 3 in its entirety so as to read as follows:

NOTE 3—The first article testing shall be conducted by the contractor concurrently with the initial production testing on the same two (2) production units as subjected to the initial production testing.

If the quoted portion of paragraph "c" of note 2 and note 3, as changed in the manner indicated in the preceding paragraph of this opinion, should be construed as applying to xenon lamps apart from searchlights, this would mean, of course, that Varo thereby become responsible for performing (or having performed) first-article tests on xenon lamps as well as initial-production tests, but it would also mean that all such tests were to be performed on the same two production lamps.

In any event, therefore, Varo's obligation for the sort of testing discussed in this part of the opinion was limited to two lamps, and did not extend to five lamps, as held by the Board.

It appears, from the previous summary of the evidence, that there was actual compliance with the testing requirement, irrespective of whether it was Varo's obligation to perform (or to have performed) only initial-production tests on two lamps, or to perform both first-article and initial-production tests on two lamps.

Hanovia produced, in one continuous production run, all the lamps needed to fulfill its prime contract with the Army and to supply Varo with the lamps which the latter needed to fulfill its contract with the Army. No distinction was made in the production process between lamps which Hanovia would ultimately supply directly to the Army and lamps which Hanovia would supply to Varo and the latter, in turn, would furnish to the Army. At the outset of the production process, two lamps were subjected to the prescribed first-article tests and to the prescribed initial-production tests.

This was what the Government wished to have done in order to ensure that the lamps to be produced would comply in all respects with the requirements of the lamp specification, which called for a new sort of lamp not previously produced by any lamp manufacturer.

Lamps produced later in the production run were not first-article or initial-production lamps. Consequently, the subjection of such lamps to an additional series of first-article and initial-production tests not only would have failed to make "economic

■■■■■■■■■■■■■■■■■■■

sense," as the Board said, but it also would have failed to comply with the requirements of Varo's contract with the Army, since the contract required that such tests be performed at the beginning of the production process, as was actually done.

■ If Hanovia derived some financial benefit from the circumstance that the first-article and initial-production tests which it performed on xenon lamps qualified such lamps both under its prime contract with the Army and under its subcontract with Varo, such benefit was not passed on to Varo in whole or in part and did not reduce Varo's costs. In this connection, see the discussion in the preceding part of this opinion.

In view of the foregoing discussion, it is not necessary to discuss a contention by the plaintiff that the contracting officer's action of July 17, 1969, in approving Varo's first-article and initial-production test report, based on Hanovia's testing of xenon lamps, precluded the successor contracting officer from demanding payment from Varo on the ground that required tests had not been performed, or a contention that the evidence in the administrative record does not provide substantial support for the Board's factual finding that it would have cost Varo $6,000 per lamp if Varo had performed (or caused to be performed) additional first-article and initial-production tests on five xenon lamps.

## CONCLUSION

The plaintiff's motions for summary judgment are allowed, the defendant's cross-motion for summary judgment is denied, and judgment is entered for the plaintiff in the sum of $37,118.16.